WATERMAN, Justice (dissenting).
I respectfully dissent and would affirm the district court's summary judgment and the court of appeals decision affirming it under our long-standing precedent enforcing *802 the legal effect of guilty pleas. I join Justice Mansfield's separate dissent. This year, the United States Supreme Court resoundingly reiterated a fundamental legal tenet: a valid guilty plea waives the defendant's constitutional right to trial and right to confront witnesses and "relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.' " Class v. United States , 583 U.S. ----, ----, 138 S.Ct. 798, 805, 200 L.Ed.2d 37 (2018) (quoting United States v. Broce , 488 U.S. 563, 573-74, 109 S.Ct. 757, 764, 102 L.Ed.2d 927 (1989) ). A guilty plea precludes a defendant from a later challenge in which he would "deny that he engaged in the conduct to which he admitted." Id. All nine justices agreed with that proposition. See id. at ----, 138 S.Ct. at 815 (Alito, J., dissenting).[7] When Schmidt confessed in open court and pled guilty, he closed the door to his subsequent claim that he is factually innocent, that is, that he really did not do what he admitted doing. The majority today errs by relying on cases in which the defendant steadfastly maintained his or her innocence through trial and all subsequent appeals.
I would also affirm summary judgment based on the statute of limitations because Schmidt knew what really happened in the bedroom and knew when he pled guilty whether his victim, B.C., and the eyewitness, Peter, were lying. Schmidt knowingly and voluntarily waived his right to challenge their allegations when he pled guilty in a detailed colloquy with the court while represented by effective defense counsel. Iowa law has always provided innocent people a forum to prove their innocence-through a trial. Schmidt is an admittedly guilty man who chose to give up his right to trial.
The majority undermines the finality of guilty pleas and eviscerates the three-year statute of limitations for postconviction-relief (PCR) actions. Today's decision will have bad consequences, as counsel for the State warned, including fewer plea bargains, renewed turmoil for victims and their families years after the crime, and a flood of PCR applications. The majority, by remanding this case instead of itself applying its new standard on the existing record, needlessly leaves district courts in the dark on whether evidentiary hearings or new trials will be required whenever a victim or other witness recants years after a defendant, ably represented by competent counsel, formally confessed to the crime in open court through a guilty plea devoid of legal error. Soon, we will see PCR applications by defendants who pled guilty to domestic assault and now bully the survivors into recanting.
Courts appropriately regard recantations with the utmost suspicion-especially those involving intrafamily sexual abuse. In my view, summary judgment can and should be affirmed on the existing record after remand under the majority's newly adopted test for actual innocence. This is *803 because Schmidt cannot show, despite B.C.'s "recantation," that no reasonable juror could convict him based on Peter's unrecanted eyewitness account of catching Schmidt in the act and B.C.'s contemporaneous statements and forensic interview describing the sexual assault. Indeed, Iowa juries, even without eyewitness testimony, have convicted defendants charged with domestic abuse based solely on what the victim said happened right after the abuse, disbelieving the victim's subsequent recantation at trial.[8] B.C.'s quasi- recantation essentially can be paraphrased as, "I said it happened back then, but now that my much bigger brother is getting out of prison I'm telling people it didn't happen-you guess which story is true." This equivocal recantation should be insufficient to vacate Schmidt's guilty plea. I would wait for a better test case to adopt a standard for relief under an actual-innocence theory.
I. The District Court Properly Granted Summary Judgment Based on Schmidt's Guilty Plea.
The majority is unable to find fault with the manner in which Schmidt pled guilty. Schmidt raises no claim that his counsel was ineffective and alleges no defect or constitutional infirmity in connection with his guilty plea. The majority, nevertheless, allows Schmidt, and presumably any other convicted offender, to belatedly challenge a guilty plea based solely on someone's subsequent recantation. The majority thereby upends Iowa law on the finality of guilty pleas and does so without acknowledging the many built-in protections our legal system employs to ensure the validity of plea-based convictions and without quoting Schmidt's in-court colloquy showing those safeguards were followed to the letter in his case.
Until today, it had been "well settled that a plea of guilty 'waives all defenses or objections which are not intrinsic to the plea itself.' " State v. Alexander , 463 N.W.2d 421, 422 (Iowa 1990) (quoting State v. Morehouse , 316 N.W.2d 884, 885 (Iowa 1982), overruled on other grounds by State v. Kress , 636 N.W.2d 12, 20 (Iowa 2001) ). I would honor stare decisis and affirm Schmidt's conviction under the foregoing precedent.
Generally, a criminal defendant waives all defenses and objections to the criminal proceedings by pleading guilty .... One exception to this rule involves irregularities intrinsic to the plea-irregularities that bear on the knowing and voluntary nature of the plea.
Castro v. State , 795 N.W.2d 789, 792 (Iowa 2011) (citation omitted) (addressing when ineffective assistance of counsel constitutes an irregularity intrinsic to the plea by rendering it involuntary or unknowing). Schmidt does not dispute the district court's finding that his guilty plea was knowing and voluntary, and he has never alleged ineffective assistance of counsel.
"A plea colloquy that covers the specific ground subsequently raised in a postconviction relief application would normally support summary judgment on those grounds." Id. at 795. The district court properly considered Schmidt's admissions in his plea colloquy and the legal effect of his guilty plea in granting the State's motion for summary disposition of the PCR action. See id. Schmidt was not entitled to an evidentiary hearing on the veracity of B.C.'s recantation without first establishing that his guilty plea was unknowing or involuntary. It is undisputed that Schmidt pled guilty and admitted to the crimes in the plea colloquy. The legal effect of his guilty plea is a question of law the district court correctly decided by summary judgment *804 on the existing PCR record. See id. at 793, 795-96.
Nothing B.C. says now or said in 2006 may be regarded as an irregularity intrinsic to Schmidt's guilty plea. "Any subsequently-discovered deficiency in the State's case that affects a defendant's assessment of the evidence against him, but not the knowing and voluntary nature of the plea, is not intrinsic to the plea itself." State v. Speed , 573 N.W.2d 594, 596 (Iowa 1998). "Notions of newly discovered evidence simply have no bearing on a knowing and voluntary admission of guilt." Alexander , 463 N.W.2d at 423. New exculpatory evidence does not alter "a defendant's understanding of what a plea means." Speed , 573 N.W.2d at 596 (distinguishing the "defendant's tactical rationale for pleading guilty"). Thus, "[a] guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities." Kyle v. State , 322 N.W.2d 299, 304 (Iowa 1982) (quoting United States v. Bluso , 519 F.2d 473, 474 (4th Cir. 1975) ). I would keep the proverbial lid on the box. When a tenable claim of actual innocence comes along, we will know it. This is not such a case.
The majority upends our long-standing precedent on guilty pleas. I find it astounding that neither the majority nor the special concurrence ever mentions stare decisis, the doctrine that provides stability, predictability, and legitimacy to our law. Just months ago, our court unanimously reiterated, "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." State v. Iowa Dist. Ct. , 902 N.W.2d 811, 817 (Iowa 2017) (quoting McElroy v. State , 703 N.W.2d 385, 394 (Iowa 2005) ); see also Bd. of Water Works Trs. v. Sac Cty. Bd. of Supervisors , 890 N.W.2d 50, 61 (Iowa 2017) ("Legal authority must be respected ... because it is important that courts, and lawyers and their clients, may know what the law is and order their affairs accordingly." (quoting State v. Liddell , 672 N.W.2d 805, 813 (Iowa 2003) ) ). We may overrule a decision found to be "clearly erroneous" when "compelling reasons exist" to do so. State v. Williams , 895 N.W.2d 856, 859-60 (Iowa 2017) (overruling State v. Wing , 791 N.W.2d 243 (Iowa 2010) ). In Wing , a divided court had overturned long-standing Iowa precedent and adopted a new interpretation of the speedy indictment rule that proved unworkable in practice; by overruling Wing , our court restored the prior long-standing Iowa rule that worked well. See id. at 867-68 (Mansfield, J., specially concurring). The Williams majority devoted a section of the opinion to stare decisis. See id. at 859-60 (majority opinion). The dissent lectured about the importance of the doctrine and pointedly "call[ed] for the restoration of the principle of stare decisis in Iowa jurisprudence." Id. at 870 (Wiggins, J., dissenting). Yet today the same members of this court say nothing about stare decisis and overrule countless decisions without showing that our guilty plea precedent was clearly erroneous or unworkable.
Iowa law requires a detailed guilty plea colloquy to satisfy the court that the defendant's plea is knowing and voluntary and that there is a factual basis for the crime. See Iowa R. Crim. P. 2.8(2)(b ) ; see also Diaz v. State , 896 N.W.2d 723, 732-34 (Iowa 2017) (vacating guilty plea based on ineffective assistance of counsel because plea colloquy failed to address the postdeportation immigration consequences of the conviction). Iowa Rule of Criminal Procedure 2.8 requires the court to determine "the plea is made voluntarily and intelligently and has a factual basis." Iowa R. Crim. P. 2.8(2)(b ). Before accepting a plea, the court must address the defendant in *805 open court and determine if he or she understands
(1) The nature of the charge to which the plea is offered.
(2) The mandatory minimum punishment, if any, and the maximum possible punishment provided by the statute defining the offense to which the plea is offered.
(3) That a criminal conviction, deferred judgment, or deferred sentence may affect a defendant's status under federal immigration laws.
(4) That the defendant has the right to be tried by a jury, and at trial has the right to assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right not to be compelled to incriminate oneself, and the right to present witnesses in the defendant's own behalf and to have compulsory process in securing their attendance.
(5) That if the defendant pleads guilty there will not be a further trial of any kind, so that by pleading guilty the defendant waives the right to a trial.
Id. The court also must inquire "whether the defendant's willingness to plead guilty results from prior discussions between the attorney for the state and the defendant or the defendant's attorney" and disclose the plea agreement on the record. Id. r. 2.8(2)(c ). Schmidt alleges no violation of rule 2.8 in this PCR action.
Here, the district court fully complied with rule 2.8 in accepting Schmidt's guilty plea. The district court described the legal rights Schmidt would have if he withdrew the plea and went to trial, and Schmidt informed the court he understood his rights and wished to plead guilty to the charges. The court reviewed the factual basis for each count. The prosecutor recited the elements of assault with intent to commit sexual abuse and the maximum and minimum penalties for that offense. After confirming Schmidt understood, the court inquired whether the minutes of testimony were accurate concerning this offense:
THE COURT: ... What I am trying to find out is with regard to the elements of this crime, I'm talking about assault with intent to commit sexual abuse, and we have described those elements to you, in connection with those elements, do the Minutes of Testimony, that is what the witnesses would say at trial, do they accurately and truthfully tell us what you did?
THE DEFENDANT: Yes, sir.
....
THE COURT: Just tell me what you did that makes you think you are guilty.
THE DEFENDANT: I grabbed a child and tried to perform a sex act against his will.
....
THE COURT: Is [B.C.] the person you tried to commit a sex act with?
THE DEFENDANT: Yes, sir.
THE COURT: Did this occur on or about February 25th, 2006, in Woodbury County, Iowa?
THE DEFENDANT: Yes, sir.
THE COURT: Do you understand that by grabbing him, the state alleges you assaulted him by that grabbing? Do you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: The state claims that by grabbing him and making this attempt, that this was offensive to [B.C.]. Do you agree that [B.C.] could have found this grabbing offensive?
THE DEFENDANT: Probably, sir.
THE COURT: The state claims that when you grabbed him, you did so with the specific intent to commit a sex act, *806 and you said that you did grab him in an attempt to commit a sex act; is that correct?
THE DEFENDANT: Yes, sir.
THE COURT: So was that your specific intent? That was your intention at the time?
THE DEFENDANT: Yes, sir.
THE COURT: Now, a sex act in this case, the state alleges that you were attempting to make contact between your penis and anus of [B.C.]. That's what they are claiming. Is that what happened?
THE DEFENDANT: Yes, sir.
....
THE COURT: Mr. Schmidt, are you telling me you are, in fact, guilty to this crime of assault with intent to commit sexual abuse?
THE DEFENDANT: Yes, sir.
Next, the prosecutor recited the elements of incest and the maximum and minimum penalties. After confirming Schmidt understood, the court engaged in another colloquy:
THE COURT: ... With regard to the elements of this crime of incest, do these summaries of what the witnesses would say with regard to the elements of that crime, truthfully and accurately describe what you did?
THE DEFENDANT: Okay. I performed the sex act-Yes, sir. Those are accurate.
....
THE COURT: Now I need to have you tell me in your own words what you did that makes you think that you are guilty of this charge.
THE DEFENDANT: I performed a sex act on a minor child.
....
THE COURT: The state claims that the sex act that you performed was contact between your penis and [B.C.'s] anus. Do you agree that that was the contact that was performed?
THE DEFENDANT: Yes, sir.
....
THE COURT: Do you agree that at the time that you performed the sex act upon [B.C.] that he was your brother?
THE DEFENDANT: Yes, sir.
Schmidt told the court he was satisfied with the services of his counsel. The court accepted Schmidt's guilty plea, finding the plea was "made voluntarily and intelligently" and Schmidt "underst[ood] the legal rights that he [was] giving up by pleading guilty to each of these two charges." Schmidt does not challenge those findings, which the district court and court of appeals correctly determined required the summary dismissal of his PCR action.
A plea must "be a genuine one, by a defendant who is guilty; one who understands his situation, his rights, and the consequences of the plea, and is neither deceived nor coerced." State v. Hinners , 471 N.W.2d 841, 843 (Iowa 1991) (quoting State v. Whitehead , 163 N.W.2d 899, 902 (Iowa 1969) ). A guilty plea is effectively a confession of committing the crime made under judicial oversight with representation by defense counsel. See Woods v. State , 52 Kan.App.2d 958, 379 P.3d 1134, 1141 (2016). That is what we have here. As the United States Supreme Court has held, "A plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need b[e] advanced .... It supplies both evidence and verdict, ending controversy." Boykin v. Alabama , 395 U.S. 238, 242 n.4, 89 S.Ct. 1709, 1712 n.4, 23 L.Ed.2d 274 (1969) (alteration in original) (quoting Woodard v. State , 42 Ala.App. 552, 171 So.2d 462, 469 (1965) );
*807 see also Class , 583 U.S. at ----, 138 S.Ct. at 804 (majority opinion) ("The plea of guilty is, of course, a confession of all the facts charged in the indictment, and also of the evil intent imputed to the defendant." (quoting Commonwealth v. Hinds , 101 Mass. 209, 210 (1869) ) ). For this reason, the United States Supreme Court and, until today, our court has upheld knowing and voluntary guilty pleas. See Brady v. United States , 397 U.S. 742, 757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970) ("A defendant is not entitled to withdraw his plea merely because he discover[ed] long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action."); Speed , 573 N.W.2d at 597 ("The fact that an accused may elect to plead guilty to a lesser offense when he is also charged with a more serious offense does not make his plea coerced." (quoting State v. Lindsey , 171 N.W.2d 859, 865 (Iowa 1969) ) ).
Schmidt relies on People v. Whirl , which allowed postconviction claims to proceed to challenge a conviction resulting from a guilty plea following a confession coerced by police torture. 395 Ill.Dec. 647, 39 N.E.3d 114, 117 (Ill. App. Ct. 2015). That case is inapposite because Schmidt claims no torture, coercion, or other constitutional violation in connection with his guilty plea.
[W]hen a defendant pleads guilty, the case is effectively closed. The [prosecutor] believes that he or she will no longer need to develop the case for presentation to a jury, and investigation and witness identification ceases. Similarly, victims believe that the case is over. Unlike a conviction by trial, which the defendant can appeal and continue to contest vigorously, when a defendant enters a plea, he or she admits wrongdoing.
People v. Schneider , 25 P.3d 755, 760 (Colo. 2001) (en banc); see also Commonwealth v. Martinez , 372 Pa.Super. 202, 539 A.2d 399, 401 (1988) ("After a defendant has entered a plea of guilty the only cognizable issues in a [postconviction] proceeding are the validity of the plea of guilty and the legality of the sentence."). The State should be able to rely on the finality of guilty pleas such as Schmidt's entered in compliance with Iowa law. As Justice Alito observed, "Roughly 95% of felony cases in the federal and state courts are resolved by guilty pleas. Therefore it is critically important that defendants, prosecutors, and judges understand the consequences of these pleas." Class , 583 U.S. at ----, 138 S.Ct. at 807 (Alito, J., dissenting).
The majority's holding undermines the value of guilty pleas. "One of the benefits to the state from a plea bargain is finality." Rhoades v. State , 880 N.W.2d 431, 447-49 (Iowa 2016) (holding guilty plea barred recovery for wrongful imprisonment). Other "factors favoring pleas include risk avoidance, conservation of prosecution and court resources, efficiency, and timeliness of disposition." Id. at 449. The State (and victims) can no longer rely on the finality of guilty pleas. If Schmidt had gone to trial in 2007, the State presumably would have proven its case then, and trial testimony would have been preserved for any retrial. Not so when trial preparation is short-circuited by a guilty plea and no trial takes place. See id. (noting the lack of a trial record when the defendant pleads guilty).
The majority fails to confront the proof problems that arise when a defendant is allowed to renege on a guilty plea years later and there is no prior trial record because of his guilty plea. Other courts avoid such problems by enforcing the guilty plea. See Weeks v. Bowersox , 119 F.3d 1342, 1355 (8th Cir. 1997) (Loken, J., *808 concurring) (acknowledging the "inherent paradox in the notion that someone who has stood in open court and declared, 'I am guilty,' may turn around years later" and claim postconviction relief); Norris v. State , 896 N.E.2d 1149, 1153 (Ind. 2008) (noting the difficulty in "harmoniz[ing] th[e] new position taken by the defendant with the fact that he originally admitted to committing the crime by his guilty plea," given that "[b]oth his confession and his new claims cannot be true"); Yonga v. State , 221 Md.App. 45, 108 A.3d 448, 461-63 (2015) (explaining that new evidence cannot be compared to a nonexistent trial record), aff'd 446 Md. 183, 130 A.3d 486, 492 (2016) (concluding "that a person who has pled guilty may not later avail himself or herself of the relief afforded by the Petition for a Writ of Actual Innocence").
The district court correctly granted the State's motion for summary judgment. Relying on the court of appeals recent decision in Walters v. State , the district court found that "newly-discovered exculpatory evidence does not provide grounds to withdraw a guilty plea 'unless it is intrinsic to the plea itself.' " No. 12-2022, 2014 WL 69589, at *3 (Iowa Ct. App. Jan. 9, 2014) (quoting Speed , 573 N.W.2d at 596 ). The court of appeals correctly affirmed the district court's summary judgment dismissing Schmidt's PCR action. The court of appeals found "the analysis and reasoning in Walters to be spot-on" and held that "because Schmidt's convictions were entered following his guilty pleas, he cannot challenge those convictions in a PCR action on the basis of newly discovered evidence in the form of his victim's alleged recantation." I agree.
Nothing in today's majority opinion should preclude the State from introducing Schmidt's guilty plea colloquy into evidence at the postremand hearing. In my view, Schmidt's admissions of guilt in 2007 entitle the State to summary dismissal of his PCR claims. See Castro , 795 N.W.2d at 795.
II. B.C.'s "Recantation" Is Insufficient to Vacate Schmidt's Guilty Plea.
We have never vacated a guilty plea based on the victim's recantation. The majority fails to mention that "[w]e have repeatedly held that a witness' recantation testimony ... is looked upon with the utmost suspicion." Jones v. State , 479 N.W.2d 265, 275 (Iowa 1991). Our skepticism of recantations is widely shared. Haouari v. United States , 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.' " (quoting Ortega v. Duncan , 333 F.3d 102, 107 (2d Cir. 2003) ) ); see also Yonga , 108 A.3d at 475 (noting "post-trial recantation[s] of witnesses are looked on with the utmost suspicion" (quoting Carr v. State , 39 Md.App. 478, 387 A.2d 302, 305-06 (1978), rev'd on other grounds , 284 Md. 455, 397 A.2d 606 (Md. 1979) ) ); Addai v. State , 893 N.W.2d 480, 483 (N.D. 2017) ("This Court reviews recanting testimony with suspicion and disfavor.").
This is because recantations "upset[ ] society's interest in the finality of convictions, [are] very often unreliable and given for suspect motives, and most often serve[ ] merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."
Haouari , 510 F.3d at 353 (alterations in original) (quoting Dobbert v. Wainwright , 468 U.S. 1231, 1233-34, 105 S.Ct. 34, 36, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari) ).
Our distrust is heightened when the recanting victim is a child sexually abused by a family member. See, e.g. , *809 State v. Kostman , 585 N.W.2d 209, 210 (Iowa 1998) (per curiam) ("The victim further admitted he once recanted the allegations because he and Kostman 'went camping together and always had fun and [he] didn't want to see nothing happen to him and it was just-[he] was just kind of scared.' " (Alteration in original.) ). In State v. Tharp , the defendant's stepdaughter recanted her testimony that he had sexually abused her. 372 N.W.2d 280, 282 (Iowa Ct. App. 1985). The district court denied his motion for new trial. Id. The court of appeals affirmed, observing,
A witness' recantation of her testimony is looked upon with the utmost suspicion, and does not necessarily entitle the defendant to a new trial. The trial court must make its decision based on the facts of the whole trial and those in conjunction with the motion. The victim was a 15 year old stepdaughter of defendant. In cases of this type, where families are torn apart, there is great pressure on the child to "make things right."
Id. (footnote omitted) (citations omitted).
This view too is widely shared. See United States v. Provost , 969 F.2d 617, 621 (8th Cir. 1992) ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."); Myatt v. Hannigan , 910 F.2d 680, 685 n.2 (10th Cir. 1990) ("[T]he child's recanting of her statement to family members is not atypical in sex abuse cases."); Schneider , 25 P.3d at 763 ("Skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon."); State v. Gallagher , 150 Vt. 341, 554 A.2d 221, 225 (1988) (allowing hearsay exception for child victims of sex crimes because of "the high probability of a child victim recanting a statement about being abused sexually"); see also Norris , 896 N.E.2d at 1155 (Boehm, J., concurring) (viewing recantation of victim's mother as "inherently somewhat suspect, coming as it does after the fact and from [a] relative[ ] of the defendant").[9]
Recantations are especially common with victims of domestic violence. See State v. Smith , 876 N.W.2d 180, 187-88 (Iowa 2016) (citing authorities concluding many victims of domestic violence recant); id. at 194 (Waterman, J., dissenting) ("The rate of recantation among domestic violence victims has been estimated between eighty and ninety percent."). After today, we can *810 expect that offenders who already pled guilty will try to pressure their victims to recant.
Mindful of the law's appropriate distrust of recantations by victims of child sex abuse, I conclude B.C.'s fainthearted "recantation" is insufficient to vacate Schmidt's guilty plea. B.C.'s affidavit stated in its entirety:
I, [B.C.], being first duly sworn hereby depose and state as follows:
I was the victim in Woodbury County Criminal Case FECR054257, State of Iowa vs. Jacob Schmidt. Jacob Schmidt is my brother. I am currently 23 years of age, but was a child at the time of the criminal case. At the time of the original criminal case, I had told various people that Jacob had sexually abused me. When I was 21 years old, I told other people that Jacob had never touched me in a sexual way or sexually abused me. I didn't tell anyone before that date that nothing had really happened, and so Jacob couldn't have known before then. I decided to tell people when I turned 21 since I was a full adult at that time. I want to see my brother and tell him I am sorry that I couldn't tell anyone before then.
Notably, B.C. never stated under oath which story he told is true. Nor did B.C. claim that police or his family induced him to lie in 2007. The timing of B.C.'s new story seven years later coincides with Schmidt's expected release from prison. On February 25, 2006, the night Peter caught Schmidt in the act of attempting to rape B.C., Schmidt stood six foot, three inches tall and weighed between 350 and 400 pounds. B.C., who had just celebrated his fourteenth birthday, was four feet, six inches tall and weighed between seventy-five and ninety pounds. While B.C. may have added some pounds and inches since then, I can understand his motivation to make peace with his much larger half-brother before Schmidt's release from prison.
Perhaps an evidentiary hearing on remand will bring this matter to a swift conclusion. "The trial court is not required to believe the recantation ...." State v. Compiano , 261 Iowa 509, 517, 154 N.W.2d 845, 849 (1967). To the contrary, if the court believes the recantation is false,
and is not reasonably well satisfied that the testimony given by the witness [at] trial was false, ... it is not at liberty to shift upon the shoulders of another jury the responsibility to seek out the truth of that matter.
Id.
We have repeatedly affirmed denials of applications for postconviction relief based on witness recantations. See Jones , 479 N.W.2d at 275 (affirming district court's denial of application for PCR because "Jones' entire claim is based upon an assumption that Coleman's trial testimony was in fact false," but "[t]he postconviction court is certainly not required to believe the recantation"); State v. Folck , 325 N.W.2d 368, 377 (Iowa 1982) ("Recantation of trial testimony is viewed with suspicion, and the trial court has broad discretion in looking to the whole record to determine if defendant had a fair trial."); see also State v. Frank , 298 N.W.2d 324, 329 (Iowa 1980) (noting testimony later recanted still had probative value); State v. Taylor , 287 N.W.2d 576, 578 (Iowa 1980) (affirming denial of motion for new trial because a recantation is "not really based on newly discovered evidence"); State v. Jackson , 223 N.W.2d 229, 234 (Iowa 1974) ("The general rule is a witness' recantation should be looked upon with utmost suspicion.").
When the witness's original testimony is corroborated by other evidence supporting the conviction following a jury trial, a subsequent *811 recantation seldom warrants relief. See Adcock v. State , 528 N.W.2d 645, 648 (Iowa Ct. App. 1994) (affirming district court's denial of postconviction relief when witness recanted because "there was other evidence connecting Adcock to the crime"); see also Frank , 298 N.W.2d at 329-30 (affirming conviction when independent evidence corroborated witness's original testimony that she later recanted). Peter's unrecanted eyewitness account corroborates B.C.'s original contemporaneous report to the police and forensic interviewer. Schmidt therefore is not entitled to relief from his conviction.
III. Schmidt's PCR Action Is Untimely.
I would also affirm the summary judgment because Schmidt's PCR application-filed seven years after his conviction-is time-barred under Iowa Code section 822.3's three-year statute of limitations. The majority holds it is not time-barred because Schmidt could not know within the limitations period that B.C. would later recant. But Schmidt did know what happened in the bedroom in 2006 and knew then whether the allegations made by Peter and B.C. were false.
PCR actions "must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." Iowa Code § 822.3 (2014). An exception is made for applications claiming "a ground of fact or law that could not have been raised within the applicable time period." Id. The three-year time-bar "limit[s] postconviction litigation in order to conserve judicial resources, promote substantive goals of the criminal law, foster rehabilitation, and restore a sense of repose in our system of justice." Wilkins v. State , 522 N.W.2d 822, 824 (Iowa 1994) (quoting State v. Edman , 444 N.W.2d 103, 106 (Iowa Ct. App. 1989) ). A corollary purpose is " 'to reduce injustices occurring as a result of lost witnesses' necessary to resolve factual issues arising in postconviction proceedings and upon retrial of cases where convictions have been overturned." Dible v. State , 557 N.W.2d 881, 885 (Iowa 1996) (quoting Brewer v. Iowa Dist. Ct. , 395 N.W.2d 841, 843 (Iowa 1986) ), abrogated on other grounds by Harrington v. State , 659 N.W.2d 509, 521 (Iowa 2003).
To further those goals, the exception to the three-year time-bar in section 822.3 is limited to claims in which the applicant had "no opportunity to test the validity of the conviction in relation to [the ground of fact or law that allegedly could not have been raised within the time period]." Wilkins , 522 N.W.2d at 824 (alteration in original) (quoting Edman , 444 N.W.2d at 106 ). An applicant may not assert a claim he or she has "at least been alerted to" in the prior action. Id. This promotes repose and conserves judicial resources. See id. (holding second application for relief was time-barred when applicant should have been alerted to "ground of fact" in prior postconviction application); see also Dible , 557 N.W.2d at 886 (barring action when applicant was aware of ground of fact because "[a]ny other decision would result in an endless procession of postconviction actions, and the legislature's hope to avoid stale claims and to achieve a sense of repose in the criminal justice system would not be realized").
The State filed a two-pronged motion for summary judgment to dismiss Schmidt's PCR action, arguing that his (1) guilty plea barred relief and (2) PCR application was barred by the three-year statute of limitations. The State correctly argued B.C.'s statements were not "new evidence" that could not have been discovered through the exercise of due diligence:
Here, by the very nature of the case and the sexual abuse claims leveled *812 against the applicant by his younger family member, there can be no doubt that he would have known about his own involvement or non-involvement in the alleged sexual acts against his family member. He would have known what the victim or any other witness would or would not testify to if the case were to proceed to jury trial. He would have known that the victim's father was prepared to testify that he caught the applicant in the act with his pants down, penis exposed, and kneeling right behind the bare anus of the victim in the bedroom. He would have known that the victim had given a recorded interview to Mercy CAC stating that the sexual acts did in fact occur. All of this would have been readily available to the applicant at the time of his plea of guilty and subsequent conviction and as such he would have known about the veracity of said statements.
I agree.
"[T]he objective of the escape clause of section 822.3 is to provide relief from the limitation period when an applicant had 'no opportunity' to assert the claim before the limitation period expired." Cornell v. State , 529 N.W.2d 606, 611 (Iowa Ct. App. 1994) (quoting Wilkins , 522 N.W.2d at 823-24 ). "[T]he focus of our inquiry has been whether the applicant was or should have been 'alerted' to the potential claim before the limitation period expired." Id. (quoting Wilkins , 522 N.W.2d at 824 ).[10] Schmidt was alerted to his own actual-innocence claim and chose to abandon it by pleading guilty. He knew when he entered his plea whether Peter and B.C. were telling the truth and gave up his right to a trial to cross-examine them.
This is not a case in which a new, disinterested witness has come forward. See State v. Burgess , 237 Iowa 162, 164-65, 21 N.W.2d 309, 310 (1946) (allowing new trial based on subsequent discovery of disinterested alibi witness, a train conductor, when the defendant "was the only witness who testified at the trial that he was on the train at the time the state's witnesses testified the crime was committed [elsewhere, because c]learly the evidence of the conductor of the train, placing the [defendant] on the train at the time of the commission of the crime, was not cumulative"). And this is not the case of a mere he-said, he-said account without another witness to the incident.[11] Peter walked in on and witnessed *813 Schmidt's attempted assault on B.C.
Nor has Schmidt come forward with new physical evidence or new scientific developments that were previously undiscovered.[12] See More v. State , 880 N.W.2d 487, 508 (Iowa 2016) (considering as newly discovered evidence FBI announcement that previous testimony on bullet identification was "not scientifically supportable").
B.C.'s recantation is "not new evidence in the real sense." Compiano , 261 Iowa at 517, 154 N.W.2d at 849. "On the contrary, it is but an assertion by affidavit that the former testimony given by the witness was false." Id. ; see also Taylor , 287 N.W.2d at 578 (same). As the Kansas Court of Appeals stated,
By entering a plea of guilty, Woods was well aware of the facts of the case. In fact, he knew the extent of his involvement in the events of the evening better than anyone else. Based on the preliminary hearing, the pretrial motions filed with the court, and the documents exchanged by the parties, Woods knew that at least on the planned day of trial ... some witnesses were going to testify on his behalf and some were not. He freely and voluntarily chose not to take his chances with a trial. The fact that at some point on or after [the trial date], some-though not all-witnesses appear to have recanted previous incriminating statements or returned to original statements does not change the fact that Woods decided not to risk the consequences of facing a trial ....
Woods , 379 P.3d at 1141.
Our decision in Harrington , 659 N.W.2d 509, does not require a different result. In Harrington , we stated that newly discovered, previously undisclosed police reports together with recantations by three trial witnesses qualified as a ground of fact that could not have been raised within the three-year window. 659 N.W.2d at 521. A jury found Terry Harrington guilty of murder in 1978. Id. at 514. Harrington had presented an alibi defense at trial that was undermined by several witnesses who placed him with accomplices on the night of the murder. Id. at 515. Over twenty years later, Harrington filed an application for postconviction relief. Id. Three witnesses had come forward, recanting their trial testimony that placed him with accomplices. Id. at 516-17. One recanting witness "claim[ed] he gave a contrary story at trial because he was pressured by the prosecutors and police." Id. at 517. Another "said he lied [at trial] to obtain a $5000 reward ... and to avoid being charged with the crime." Id. Harrington's counsel also discovered Brady violations-eight police reports containing exculpatory *814 information withheld by the state.[13] Id. at 518-19. "Harrington argued this newly discovered evidence warranted vacation of his conviction." Id. at 518. Concluding we were bound by the district court's factual findings, we stated,
With respect to both the undisclosed police reports and the recantation evidence, the [district] court held, in ruling on Harrington's substantive claims, that he had proved they were discovered after the verdict in his criminal trial and that they could not have been discovered earlier than they were discovered in the exercise of due diligence. These findings are clearly supported by substantial evidence, which we have reviewed above, and so are binding under the standard of review applicable to the statute-of-limitations issue.
Id. at 521. We concluded Harrington's PCR application was not time-barred, see id. , but went on to determine the Brady violations alone entitled him to a new trial, id. at 525.
Harrington is distinguishable. Schmidt alleges no Brady violations. No unrecanting eyewitness caught Harrington in the criminal act. The district court made no finding B.C.'s recantation was newly discovered evidence. And B.C. makes no claim he was paid or pressured to testify falsely when Schmidt was charged. Most significantly, unlike Schmidt, Harrington did not plead guilty but steadfastly maintained his innocence. Id. at 523 & n.10.
IV. Schmidt's Actual-Innocence Claim Fails.
The majority today adopts for the first time a freestanding actual-innocence claim for postconviction relief. Under this new standard,
[f]or an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence.
In my view, Schmidt fails to meet this standard as a matter of law.
The Supreme Court has stated that an applicant claiming actual innocence must present "new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup v. Delo , 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995). Requiring new reliable evidence significantly reduces "[t]he threat to judicial resources, finality, and comity posed by claims of actual innocence." Id. at 324, 115 S.Ct. at 866. Assessing reliability, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." Id. at 332, 115 S.Ct. at 869.
Moreover, to succeed on an actual-innocence claim, the applicant also must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier , 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). The court must therefore assess the merits of the claim, considering " 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' " House v. Bell , 547 U.S. 518, 538, 126 S.Ct. 2064, 2077, 165 L.Ed.2d 1 (2006) (quoting *815 Schlup , 513 U.S. at 327-28, 115 S.Ct. at 867 ). Most importantly, the applicant must show it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 556, 126 S.Ct. at 2087 (Roberts, C.J., concurring in part and dissenting in part) (quoting Schlup , 513 U.S. at 327, 115 S.Ct. at 867 ). This requires more than a showing that "reasonable doubt exists in the light of the new evidence." Schlup , 513 U.S. at 329, 115 S.Ct. at 868. Rather, the applicant must prove "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. This standard is "demanding and permits review only in the 'extraordinary' case." House , 547 U.S. at 538, 126 S.Ct. at 2077 (majority opinion) (quoting Schlup , 513 U.S. at 327, 115 S.Ct. at 867 ). Because the inquiry "involves evidence the trial [court] did not have before it, the inquiry requires the ... court to assess how reasonable jurors would [have] react[ed] to the overall, newly supplemented record." Id. at 538, 126 S.Ct. at 2078.
Schmidt cannot show it is more likely than not in light of B.C.'s recantation that no reasonable juror would have convicted him. Peter personally witnessed Schmidt's attempt to sexually assault B.C., literally catching them with their pants down. Police officers took contemporaneous statements from Peter and B.C. at the scene within minutes of the incident. The police officers could have testified as to what B.C. and Peter described minutes after the incident under the excited utterance exception to the hearsay rule. See Iowa R. Evid. 5.803(2) (defining excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"); see also State v. Richards , 809 N.W.2d 80, 95 (Iowa 2012) (holding domestic violence victim's statement to daughter about choking while victim's neck was still red was admissible as an excited utterance). Moreover, B.C. gave a recorded forensic interview five days later in which he detailed the events of the night and disclosed Schmidt's past assaults. That video, recorded while his memory was fresh, could be used to impeach his subsequent recantation. See Iowa R. Evid. 5.613(b ) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."); see also State v. Austin , 585 N.W.2d 241, 243-44 (Iowa 1998) (concluding district court properly admitted videotape of child victim describing sexual abuse recorded shortly after it occurred, when defense counsel opened the door by cross-examining the child about inconsistent statements); Chambers v. State , 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (en banc) (allowing jury to consider recorded statement of child discussing abuse despite child's recantation at trial); State v. Church , 167 Vt. 604, 708 A.2d 1341, 1342 (1998) (allowing state to present rehabilitating testimony from witness whom child told she had been abused after defendant attempted to show child had recanted her testimony).
Schmidt's claim of actual innocence in this PCR action must be evaluated in light of that evidence and, as the special concurrence acknowledges, Schmidt's guilty-plea colloquy in which he admitted to the facts in the minutes of testimony establishing his crimes. See Castro , 795 N.W.2d at 795 (approving use of plea colloquy in summary disposition). Schmidt cannot succeed on his actual-innocence claim based solely on B.C.'s recantation; he cannot show no reasonable juror would convict him. I would hold that the district court properly granted the State's motion for summary *816 dismissal of Schmidt's petition for postconviction relief.
This case falls outside the typical categories of cases of actual innocence. In Rhoades , we reviewed a growing body of scholarship on wrongful convictions. 880 N.W.2d at 434-39. Retrospective studies of cases following DNA exonerations found the wrongful convictions "were frequently based upon false confessions obtained from the defendant [during police interrogations], eyewitness identification that proved to be unreliable, failure of the state to turn over exculpatory evidence, use of unreliable informant testimony, and ineffective assistance of counsel." Id. at 435-36 (footnotes omitted). Schmidt alleges none of those.
Most wrongful convictions followed trials in which the defendant (unlike Schmidt) steadfastly maintained his or her innocence.[14] Yet "[t]hirteen percent of all wrongful convictions listed in the National Registry of Exonerations are the result of guilty pleas." Id. at 437. We stated, "Many scholars now recognize that at least in some circumstances, an innocent person may rationally decide to plead guilty." Id. at 436. Several of those circumstances are inapplicable to Schmidt: pleas to obtain immediate release for time served or pleas based on misunderstanding the elements of the crime or facts alleged. See id. at 437. Rather, Schmidt claims he pled guilty to avoid the risk of a thirty-five-year prison sentence. See id. at 436 ("[W]hen the deal is good enough, it is rational to refuse to roll the dice ... regardless of whether one is factually innocent." (quoting Russell D. Covey, Longitudinal Guilt: Repeat Offenders, Plea Bargaining, and the Variable Standard of Proof , 63 Fla. L. Rev. 431, 450 (2011) ) ). But, we previously made clear the pressure a defendant faces to plea bargain to avoid a much longer prison sentence does not render his guilty plea involuntary or justify withdrawing a plea based on newly discovered exculpatory evidence. See Speed , 573 N.W.2d at 597 ("Speed's concern that he must choose between trial on a murder charge and pleading guilty to a lesser charge has no bearing upon the voluntariness of his plea."). Schmidt's is a poor test case to adopt an actual-innocence pathway to vacating a constitutionally valid guilty plea.
Accordingly, I would not use this case to decide whether to recognize a freestanding or gateway actual-innocence claim under the Iowa Constitution for PCR
*817 actions because under any such test, Schmidt cannot satisfy the showing required for procedural or substantive relief from his guilty plea. Our court should exercise restraint today rather than trying to set the table now for a meritorious actual-innocence claim that may come to us in the future. As we stated in State v. Keeton , "fundamental principles of judicial restraint limit our role to deciding each case on the issues presented, and we refrain from deciding issues not presented by the facts." 710 N.W.2d 531, 533-34 (Iowa 2006). I would wait for a case presenting compelling proof of actual innocence before deciding the parameters for allowing postconviction challenges to defect-free guilty pleas. As our court unanimously reiterated in Keeton ,
[w]e recognize the law to be an evolving process that often makes the resolution of legal questions a composite of several cases, from which appellate courts can gain a better view of the puzzle before arranging all the pieces. The wisdom of this process has been revealed time and again, and we continue to subscribe to it today.
Id. at 534 (quoting State v. Williams , 695 N.W.2d 23, 30 (Iowa 2005) ).
For all these reasons, I dissent.
Mansfield and Zager, JJ., join this dissent.

The Class Court held the defendant's guilty plea alone did not bar his challenge to his conviction on grounds the statute of conviction was unconstitutional. 583 U.S. at ----, 138 S.Ct. at 803 (majority opinion). Iowa appears to recognize the same exception because we allow the defendant who pled guilty to later assert that the indictment or information charges no offense. See, e.g. , State v. Burgess , 639 N.W.2d 564, 567 (Iowa 2001). This is a matter intrinsic to the plea because it does not require resort to anything other than the trial information and the plea of guilty.
Schmidt makes no such constitutional challenge to the statutes he pled guilty to violating. The Class Court made clear that a defendant who pleads guilty waives any right to later contest his factual guilt, challenge the evidence against him, or retreat from factual admissions in the guilty plea. 583 U.S. at ----, 138 S.Ct. at 804, 805-06 ; id. at ----, 138 S.Ct. at 812-13 (Alito, J., dissenting).

See, e.g., State v. Smith , 876 N.W.2d 180, 183-84, 190 & n.4 (Iowa 2016).

One study showed twenty-two percent of children recant allegations, but ninety-two percent of those who recanted eventually reaffirmed the abuse. Teena Sorensen & Barbara Snow, How Children Tell: The Process of Disclosure in Child Sexual Abuse Cases , 70 Child Welfare 3, 11 (1991). The influence of family pressure and familial relationships outweighs other factors in the victim's likelihood to recant. Margaret H. Shiu, Unwarranted Skepticism: The Federal Courts' Treatment of Child Sexual Abuse Accommodation Syndrome , 18 S. Cal. Interdisc. L.J. 651, 674 (2009) ; cf. Lindsay C. Malloy et al., Filial Dependency and Recantation of Child Sexual Abuse Allegations , 46 J. Am. Acad. Child & Adolescent Psychiatry 162, 167 (2007) ("Recantation appears to reflect susceptibility to pressures from influential adults, a pattern that complements and extends decades of research on children's suggestibility. However, whereas the latter research emphasizes the dangers of false allegations of abuse that can result from external pressures, our study suggests that pressures can lead truly abused children to recant."). A victim may also recant to avoid confronting his or her abuser in the legal system. See Anoosha Rouhanian, A Call for Change: The Detrimental Impacts of Crawford v. Washington on Domestic Violence and Rape Prosecutions , 37 B.C. J.L. & Soc. Just. 1, 37 (2017) ("[A] rape victim may recant for any number of reasons other than because they were lying about the rape itself. ... [R]ape victims might recant ... because they fear confronting their attackers, whether directly or indirectly, through legal proceedings.").

Exculpatory evidence known but unavailable to the defendant at the time of his original conviction is not considered "newly discovered" when it becomes available years later. See Jones v. Scurr , 316 N.W.2d 905, 910 (Iowa 1982). In that case, one codefendant took the Fifth Amendment and another was a fugitive when Rubin Jones was convicted of first-degree murder in a jury trial in 1976. Id. at 906-07. Years later, both codefendants came forward with exculpatory evidence. Id. The district court denied postconviction relief, and we affirmed, holding the codefendants' exculpatory statements "although unavailable, [were] known to defendant, and cannot be considered newly discovered."Id. at 910. We noted Jones had failed to exercise due diligence to secure their testimony at his trial. Id. at 910 n.1. Similarly, Schmidt knew what B.C. knew and could have gone to trial and cross-examined B.C. but chose not to do so.

By contrast, the Arizona Court of Appeals affirmed a trial court ruling allowing the defendant to withdraw his Alford plea in an unwitnessed sexual assault based on the victim's recantation, which the trial court found credible in an evidentiary hearing. State v. Fritz , 157 Ariz. 139, 755 P.2d 444, 446 (Ariz. Ct. App. 1988). "[T]he victim stated that he had lied about his accusations and had acted under duress from someone seeking revenge against the defendant." Id. The appellate court noted that "[i]f the sole basis for the strength of the state's case is the credibility of the victim, as is usually the case in non-witnessed sexual assaults ... the trial court does not abuse its discretion by allowing a plea to be withdrawn [so] that the victim's credibility [can] be tested in the crucible of trial." Id.

When new DNA evidence is discovered, the defendant may proceed under Iowa Code section 81.10, which provides in relevant part,
1. A defendant who has been convicted of a felony or aggravated misdemeanor and who has not been required to submit a DNA sample for DNA profiling may make a motion to the court for an order to require that DNA analysis be performed on evidence collected in the case for which the person stands convicted.
....
9. Results of DNA analysis conducted pursuant to this section shall be reported to the parties and to the court and may be provided to the board of parole, department of corrections, and criminal and juvenile justice agencies, as defined in section 692.1, for use in the course of investigations and prosecutions, and for consideration in connection with requests for parole, pardon, reprieve, and commutation.
Id. § 81.10(1), (9).

See Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963).

See David L. Strauss, Barbarous Souls (2010) [hereinafter Strauss], for a chilling example of a life ruined by a pre-Miranda interrogation. The book chronicles the story of Darrel Parker, who came home from work in Lincoln, Nebraska, on December 14, 1955, to find his wife, Nancy, strangled in their bed. Police had reason to suspect an ex-convict, Wesley Peery, who had installed a fence at the Parker home the preceding week. Id. at 34-35, 98. Nevertheless, police investigator, John Reid, was brought in from Chicago and interrogated the grieving Mr. Parker for hours, using manipulative psychological techniques until he confessed. He recanted the next day and steadfastly maintained his innocence thereafter, but was convicted at trial based on his confession. See Parker v. Sigler , 413 F.2d 459, 465-66 (8th Cir. 1969) (holding confession involuntary), overruled on procedural grounds by Sigler v. Parker , 396 U.S. 482, 90 S.Ct. 667, 24 L.Ed.2d 672 (1970). Parker was released in 1970 after serving thirteen years in prison. Strauss, at 216. Peery ultimately confessed to the Nancy Parker murder. Id. at 224. Parker is now an eighty-seven-year-old resident of Moline, Illinois. Id. at 245.
The Reid interrogation techniques that prompted his false confession in 1955 are described in the Eighth Circuit decision holding Parker's confession to be involuntary, see Parker, 413 F.2d at 465, and discussed at length by the Miranda Court, see Miranda v. Arizona , 384 U.S. 436, 449-58, 86 S.Ct. 1602, 1614-19, 16 L.Ed.2d 694 (1966). Jacob Schmidt is no Darrel Parker, and today's decision involves no counterpart to John Reid.